IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF WISCONSIN

---

ANTHONY P. HEARD, JR.,

      Plaintiff,

  v.

JAIME L. ADAMS and SHERYL L. KINYON,[1]

      Defendants.

OPINION and ORDER

22-cv-265-jdp

---

Plaintiff Anthony P. Heard, Jr., proceeding with recruited counsel, alleges that nursing supervisors at Wisconsin Secure Program Facility delayed in treating his severe knee and back pain and cancer symptoms; Heard was eventually sent to the hospital and diagnosed with cancer after his condition deteriorated and he was unable to keep down food. Heard proceeds on claims under the Eighth Amendment and Wisconsin medical negligence law against defendants Jaime Adams and Sheryl Kinyon.

Defendants move for summary judgment. Dkt. 57. I will grant that motion in most respects because there is no evidence suggesting that defendants were more than minimally involved in much of the medical treatment that Heard says harmed him. But I will deny defendant Kinyon summary judgment on Heard's claims that she failed to intervene after he discussed his deteriorating condition with her; the case will proceed to trial on those claims.

---

[1] I have amended the caption to amend the spelling of defendants' names as reflected in their submissions.

UNDISPUTED FACTS

I draw the following facts from the parties' proposed findings of fact and supporting evidence.

**A. Parties**

Plaintiff Anthony Heard, Jr., is an inmate in the custody of the Wisconsin Department of Corrections (DOC). The events relevant to this lawsuit took place while Heard was housed at Wisconsin Secure Program Facility (WSPF). Defendant Jaime Adams is a registered nurse who served as the health services manager at WSPF. Defendant Sheryl Kinyon is a registered nurse who was the assistant health services manager at WSPF.

In these roles, Adams and Kinyon supervised WSPF nurses and other medical staff. The Health Services Unit at WSPF was small; defendants communicated daily with staff. But defendants generally did not directly treat inmates, develop treatment plans, or supervise advanced care providers such as doctors or advance practice nurse prescribers. Defendants could discuss an inmate's treatment with a doctor or the DOC medical director if they felt that the inmate was not receiving adequate treatment, and defendants had the authority to send an inmate out for emergency care.

**B. Heard's medical care**

**1. Knee injections**

Heard has a history of chronic back pain and pain in both of his knees. Before 2019, Heard had received multiple knee injections for his pain. In early 2019, Heard was seen for ongoing pain in both of his knees. In May 2019 he was sent to an offsite clinic, where he received an injection of lidocaine and a corticosteroid for his left knee.

Heard saw Advanced Practice Nurse Practitioner Sandra McArdle multiple times in 2019 regarding pan in his right knee. She initially prescribed Heard treatments such as pain medications, ice, a knee sleeve or wrap, and weight training; in October she issued a referral to orthopedics to evaluate Heard for a right-knee injection. Offsite referrals are scheduled by a medical program assistant associate. In mid-November 2019, that staffer scheduled an offsite appointment for Heard for March 13, 2020. In December this appointment was pushed back a week. Heard continued to experience pain in his right knee, with providers telling him that he had an offsite appointment scheduled. (I take the parties to be saying that inmates are not told the dates of their upcoming offsite appointments). Also in late 2019, defendant Kinyon responded to various requests that Heard made about ice treatment and a knee brace.

Starting in March 2020, the COVID-19 pandemic caused significant disruptions for the DOC's offsite medical appointments. Only urgent offsite appointments were permitted to proceed while any non-urgent appointments were cancelled. During this time, health service managers created lists of pending offsite appointments for advanced-care-provider review and canceled or rescheduled appointments based on the advanced care provider's determination of medical necessity.

On March 16, 2020, DOC physician Dr. Ribault reviewed Heard's chart and canceled Heard's offsite knee-injection referral. Ribault determined that Heard should be seen by a provider onsite to determine if a referral offsite was medically necessary. During this time, Ribault officially worked out of Columbia Correctional Institution but also provided limited coverage to WSPF. He was trained to administer injections to the knee, and he was able to administer them onsite. But WSPF had no other provider who could perform a knee injection onsite, and Ribault didn't schedule an appointment for himself to perform it. Defendant Adams

3

entered Ribault's onsite referral. About six weeks later that referral was canceled by the medical program assistant associate without defendants' knowledge.

Over the next several months, Heard made several health service requests regarding treatment for his knee and the cancellation of his injection. These requests were triaged by other medical staff, not defendants. On July 24, 2020, Heard saw Dr. Michael Gross, a physician at WSPF, who re-ordered the offsite knee-injection referral. That same day, Heard submitted an interview/information request stating he had a delay in appointments related to knee injections and back pain. Adams responded to this request noting she had spoken with him that day. (Dr. Gross noted that Adams was present at his appointment with Heard the same day, so Adams may have been referring to discussions at that appointment.)

Heard often tried to stop Adams in the hallway to discuss his care. The parties do not explain exactly when these attempts occurred. Adams would tell Heard that he needed to submit a formal health service request because talking about his medical care in the open where anyone could overhear was inappropriate, and because Adams would not have access to his records in the hallway. Similarly, Heard would often try to speak with Kinyon in the hallway about his care; Kinyon would tell him to file a formal request.

After Heard filed an inmate grievance about the cancellation of his earlier offsite referral. The complaint examiner spoke with Kinyon about it. Kinyon learned that there was no onsite provider who could have performed the injection after Dr. Ribault canceled it. Kinyon told the examiner that Heard had been re-approved for an offsite referral. The grievance was "affirmed" (DOC's parlance for Heard winning) "to acknowledge the delay." Dkt. 39-2, at 2.

In mid-November 2020, Adams entered a note stating that Heard's orthopedics appointment had to be rescheduled because of staffing and transportation concerns. That

4

appointment was rescheduled for March 9, 2021. But Dr. Ribault canceled that order after meeting with Heard on November 19; Ribault also noted, "pending injections at a potential follow-up visit." Dkt. 60-1, at 140. On December 16, 2020, Heard was seen by Dr. Ribault and they discussed his chronic left knee pain. Ribault performed an injection of lidocaine and a steroid into Heard's left knee.

### 2. Back pain and cancer symptoms

Heard suffered from progressively worsening back pain and numbness and made numerous health service requests about his back problems. Medical staff treated him in various ways, including a physical therapy evaluation, various pain medications, ice, and muscle relaxers. In January 2020, Heard asked about a back brace, with Kinyon or Adams responding that the issue wasn't something for administrative staff to decide and that Heard should raise the issue with his doctor or physical therapist.

On May 20, 2020, Dr. Gross placed an order for Heard to receive a Transcutaneous Electrical Nerve Stimulation (TENS) unit for his back pain. A TENS unit is a small device that delivers an electrical current at or near the nerves to block or change the perception of pain.

Heard didn't immediately receive the TENS unit. In late June 2020, Heard submitted a health service request about his back pain and having not yet received the TENS unit. Heard spoke with a nurse and he received the TENS unit the same day.

In late July 2020, Heard filed an inmate grievance about delays in his back and knee pain treatment. The complaint examiner spoke with Kinyon, who incorrectly stated that Heard received the TENS unit in May 2020; Kinyon says that she misread a record from then stating that Heard was asking about the TENS unit that he had not yet received. Heard's grievance was dismissed in part based on what Kinyon had told the examiner.

Also in late July, Dr. Gross referred Heard to a physical therapist at the prison; the therapist placed Heard on a home exercise program. On September 5, 2020, Heard submitted a request about his back pain and stating that his exercises were not working. Defendant Kinyon responded by stating that she would schedule a nursing sick call, but Heard wasn't immediately seen. Heard quickly filed another request that was fielded by a nurse, who got him in to be seen on sick call. In mid-September, Dr. Gross prescribed more physical therapy and placed an order for an MRI, which was scheduled for November 25, 2020. Heard continued to complain of worsening pain, with Gross telling him that they were waiting on an MRI. Gross also arranged for the physical therapist to give him a new home exercise plan.

On October 28, 2020, Heard was sent to the emergency room for complaints of right lower quadrant abdominal pain. Heard's lab work was unremarkable and a CT scan was negative for diverticulitis or appendicitis. The radiologist's report stated "[n]o acute findings" but noted a cyst on Heard's left kidney and three lesions or cysts on Heard's liver. Dkt. 60-1, at 278–79. The radiologist suggested "consider[ing] ultrasound evaluation" for the liver lesions, *id.* at 279, but the ER doctor's own report did not mention this. Heard was discharged with a liquid diet, which he refused.

Following his return to WSPF, Heard continued to report frequent abdominal pain. In early November, Dr. Gross ordered additional lab work, an abdomen ultrasound, and a chest X-ray. All of these tests came back normal.

On November 25, 2020, Heard underwent an MRI of his lumbar spine. The MRI showed degenerative disc disease with mild central to right paracentral disc extrusion at L4-5. It also showed an incompletely evaluated left lower pole kidney lesion, which radiology suggested be further investigated.

A few days later, Heard submitted a health service request about hip pain and leg numbness. Kinyon responded two days later, stating that a nursing sick call would be placed; Heard was seen that day. On December 1, 2020, Adams and Kinyon met with Heard to discuss his concerns about his abdominal pain and kidneys. Defendants told Heard that he was scheduled for more labs the next day regarding his kidneys and that his abdominal ultrasound had come back normal. They stated that medical staff would build a plan of care after getting his lab results back. Defendants state that they did not believe that it was necessary to send Heard to the hospital because his recent ultrasound was normal, his lab results were stable, he was being seen by a nurse later in the day and new lab results would assist in making further treatment decisions.

Heard continued to submit health service requests about his back and abdomen. Defendants did not review those requests. Heard's lab results were similar to those from mid-November. Dr. Gross ordered another MRI. On December 9, Heard met with Gross. They discussed the previous MRI showing a kidney lesion, and the plans for another MRI. Heard wanted to use a larger MRI machine (he was severely overweight and perhaps claustrophobic). Gross explained that there were no large-MRI appointments available in the short term and that Gross wanted the MRI performed quickly. Gross agreed to send Heard to a local facility (with a smaller MRI machine) and to arrange for medication for claustrophobia. Heard identifies this date as pivotal: despite the alarming MRI findings and the deterioration of his condition in the following weeks, Dr. Gross did not meet with Heard again.

Also on December 9, Heard submitted a health service request asking to be seen for dehydration and other medical issues. Kinyon responded, stating, "Please let staff know when you're having issues." Dkt. 60-1, at 384. Kinyon states that she meant this response to remind

Heard to contact medical staff about his issues. Heard states that at some point around this time, Kinyon told him that he "would be seen every day until they figure out what's going on." Dkt. 34, at 35. Kinyon denies saying this to Heard, and she states that based on Heard's records to that point, there wasn't a reason for him to be seen daily by nursing.

On December 14, 2020, Adams received a call from Heard's sister, who had grown concerned about Heard's health after having a video call with him; she suggested that WSPF staff was doing nothing to help Heard. Adams and Kinyon explained that additional testing was pending and Heard's provider would use those results to decide if Heard needed to see a specialist.

Over the next several days, Heard was seen by nurses six times for complaints of back and abdominal pain and stomach cramps. On December 14, Heard reported that he had lost 10 pounds over the last week. On December 15, Heard underwent a urinalysis, which was normal.

On December 16, 2020, Heard underwent a repeat MRI of his abdomen, which showed multiple liver lesions that were suspicious for lymphoma or metastatic disease. There was also an indeterminate lesion of bone marrow around a vertebra. The radiologist concluded that the images were concerning for lymphoma or metastatic disease. Dr. Ribault saw Heard with the results of the MRI. Dr. Ribault ordered an urgent consult to UW Hematology/Oncology. In the meantime, Heard continued to be seen by nurses for complaints of abdominal and back pain.

On December 19, the Health Services Unit received a call from Heard's unit stating that Heard was suffering from stomach pain and vomiting after hearing about his imaging

results. After speaking with defendant Adams, a nurse stated that Heard should eat broth and crackers and that medical staff would monitor him. The next day, a nurse provided Heard with a liquid diet and advised him to rest and drink fluids.

On December 29, 2020, Heard underwent a liver biopsy at UW, which was sent to the lab for analysis. Heard states that at unidentified times both before and after the biopsy, he spoke with defendant Kinyon about his worsening symptoms.

On January 1, 2021, Heard was seen by a nurse for complaints of nausea and vomiting, which appeared to be getting worse. He reported that pain increased after eating and he was only having small bowel movements. The nurse stated that he may be constipated and gave him magnesium citrate, chewable calcium carbonate, and advised him to continue to eat and drink when possible. On January 2, 2021, Heard was seen by the same nurse for continued nausea and vomiting. The nurse contacted the on-call doctor, Dr. McLean, who ordered a clear liquid diet and ondansetron. The next day, Heard was seen again by another nurse about continued nausea and vomiting, reporting he was not able to keep any fluids down. Dr. McLean was contacted again. Because the ondansetron was not working and the other potential antiemetic would interact with his psychotropic medications, Dr. McLean advised that they send him to the emergency room.

A CT scan revealed a bowel obstruction, swelling of his lymph nodes increased since his last scan, and a sclerotic lesion within L4. Heard was transferred to UW Hospital for a higher level of care. Heard's liver biopsy came back negative for cancer of the liver, but UW did a lymph node biopsy on January 9, 2021, that came back positive for lymphoma. The hematology department confirmed a diagnosis of anaplastic large t-cell lymphoma.

Heard was hospitalized from January 3 to January 27, 2021. He suffered various complications while in the hospital. Upon discharge, Heard was transferred to the Dodge Correctional Institution infirmary for observation and care while he underwent chemotherapy. Heard underwent six cycles of chemotherapy; by August 2021, Heard's biopsy results were negative.

I will discuss additional facts as they are relevant to the analysis.

ANALYSIS

Heard proceeds on claims under the Eighth Amendment and Wisconsin medical negligence law regarding the following issues:

- Defendants Adams and Kinyon refused to follow through on obtaining Heard injections for his severe knee pain.

- Defendant Kinyon caused a delay in Heard receiving a TENS unit by lying to a complaint examiner about him having already received the TENS unit.

- Defendants Adams and Kinyon delayed in sending Heard to the hospital both before and after he was diagnosed with degenerative spinal disc disease and potential cancer.

## A. Eighth Amendment

I will begin with Heard's Eighth Amendment claims. The Eighth Amendment prohibits prison officials from acting with conscious disregard toward prisoners' serious medical needs. *Estelle v. Gamble*, 429 U.S. 97, 103–04 (1976). A "serious medical need" is a condition that a doctor has recognized as needing treatment or one for which the necessity of treatment would be obvious to a lay person. *Johnson v. Snyder*, 444 F.3d 579, 584–85 (7th Cir. 2006). A medical need is serious if it is life-threatening, carries risks of permanent serious impairment if left untreated, results in needless pain and suffering, significantly affects an individual's daily

10

activities, *Gutierrez v. Peters,* 111 F.3d 1364, 1371–73 (7th Cir. 1997), or otherwise subjects the prisoner to a substantial risk of serious harm, *Farmer v. Brennan*, 511 U.S. 825, 847 (1994). The evidence here raises at least a reasonable inference that Heard's maladies were serious medical needs.

A defendant "consciously disregards" an inmate's need when the defendant knows of and disregards "an excessive risk to an inmate's health or safety; the official must both be aware of the facts from which the inference could be drawn that a substantial risk of serious harm exists, and he must also draw the inference." *Snipes v. Detella*, 95 F.3d 586, 590 (7th Cir. 1996). However, inadvertent error, negligence, gross negligence, and ordinary malpractice are not cruel and unusual punishment within the meaning of the Eighth Amendment. *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996).

### 1. Knee injections

Heard alleges that defendants Adams and Kinyon refused to follow through on obtaining him injections for his severe knee pain, even though that was the only effective treatment Heard had received for that problem.

In his complaint, Heard alleged that Adams and Kinyon allowed an October 2019 offsite injection referral to be canceled under the rationale that an in-house provider could administer the injections, even though defendants knew that there was no such in-house provider available. The undisputed facts show that the medical program assistant associate scheduled an offsite orthopedics appointment for a March 13, 2020 appointment, which was later changed to a week later.

I take Heard to be arguing that defendants are in part liable because they allowed this five-month wait to occur even though Heard states that he was usually able to get an injection

about two months after a referral was made. Constitutional claims like Heard's require that a defendant have personal involvement in the constitutional violation. *Colbert v. City of Chicago*, 851 F.3d 649, 657 (7th Cir. 2017). High-level prison staff cannot be liable in their individual capacities under a theory of respondeat superior. *Jones v. City of Chicago*, 856 F.2d 985, 992 (7th Cir. 1988); *Burks v. Raemisch*, 555 F.3d 592, 595 (7th Cir. 2009) ("Bureaucracies divide tasks; no prisoner is entitled to insist that one employee do another's job."). But supervisors are liable for subordinates' conduct when they are deemed personally involved in the misconduct by "facilitat[ing] it, approv[ing] it, condon[ing] it, or turn[ing] a blind eye for fear of what they might see." *Chavez v. Illinois State Police*, 251 F.3d 612, 651 (7th Cir. 2001) (internal quotation omitted).

The medical program assistant associate scheduled this appointment, not Adams or Kinyon. Heard notes that defendants admitted that they monitor the "scheduling queue" that the medical program assistant associate uses to schedule offsite appointments; that more generally defendants, along with the nurses they supervised, shared the responsibility of monitoring the health of inmates; and that defendants retained the power to intervene in an inmate's care. But given the facts here, no reasonable jury could conclude that defendants consciously disregarded Heard's condition by failing to intervene in the five-month wait for a knee injection. There is no evidence suggesting that the medical program assistant associate dawdled in making the appointment, and months-long waits for treatment are commonplace in medical care both in and out of prisons.

Heard's treatment then became complicated by the COVID-19 pandemic, when many non-urgent offsite appointments were canceled. In March 2020, non-defendant Dr. Ribault canceled Heard's referral and instead wanted him to be seen by a prison provider to gauge

"medical necessity"; Adams entered that directive. Defendants suggest that this was so because Ribault believed that an injection could be performed in-house.

Heard argues that Adams canceled the referral, "blindly deferring" to Ribault, without verifying an alternate plan for him to receive the injection. Dkt. 67, at 3. Heard cites *Berry v. Peterman*, 604 F.3d 435, 443 (7th Cir. 2010) for the proposition that a nurse's "deference [to a doctor] may not be blind or unthinking, particularly if it is apparent that the physician's order will likely harm the patient." Heard also cites my decision in *Ledford v. Ribault*, No. 23-cv-407-jdp (W.D. Wis. Mar. 14, 2025), in which I discussed an instance in which Adams and Kinyon did speak with DOC officials about intervening in a treatment decision of Ribault's. The events of *Ledford* (occurring in late 2021 and early 2022) postdate the events in this case, so they are irrelevant if offered as proof that Adams should have been concerned about Ribault's decision-making. Rather, I take Heard's point to be that Adams had the power to intervene if she actually believed that Ribault was harming Heard. But the Eighth Amendment doesn't require nurses to double-check each decision by a doctor; the facts here do not suggest that this was one of the rare cases in which a doctor's decision-making is so obviously harmful that a nurse could violate the Eighth Amendment by failing to intervene. Particularly given the COVID pandemic and disruptions to medical treatment that it caused in and out of prison systems, no reasonable jury could conclude that Adams consciously disregarded Heard's condition by deferring to Ribault's medical judgment that an onsite provider should see Heard instead.

Then, in April 2020, the medical program assistant associate canceled the in-house referral for Heard's knee, and a complaint examiner later affirmed a grievance by Heard about the delay in receiving an injection. But there is no evidence that Adams or Kinyon were aware

13

of the April cancellation, and by the time that Heard's grievance was affirmed, Heard's new offsite appointment had already been rescheduled. Given their roles as nursing supervisors rather than front-line providers, no reasonable jury could conclude that Adams or Kinyon were responsible for these delays either.

In December 2020, Ribault gave Heard an injection in his left knee. The parties don't discuss further treatment of Heard's right knee, but in any event, Heard doesn't suggest that there is any evidence showing that defendants were personally involved in disregarding treatment of his right knee during this time. So I will grant summary judgment to defendants on Heard's Eighth Amendment claims regarding the knee injections.

### 2. TENS unit

I granted Heard leave to proceed on an Eighth Amendment claim that defendant Kinyon caused a delay in him receiving a TENS unit prescribed by a Dr. Gross in late May 2020 by lying to a complaint examiner that Heard had received the TENS unit when he hadn't yet received it. But the undisputed facts show that Heard wasn't harmed by Kinyon's response to the complaint examiner because that response occurred in August 2020, *after* Heard had already received the TENS unit in June 2020. So I will grant summary judgment to defendant Kinyon on this claim.

### 3. Delay in treatment for back pain and cancer symptoms

Heard also alleges that defendants Adams and Kinyon delayed in sending him to the hospital both before and after he was diagnosed with degenerative spinal disc disease and potential cancer. In particular, they delayed arranging further treatment even after they knew that Heard was being assessed for cancer and that he was suffering severe symptoms in addition to his back pain. Defendants argue that they were unaware of Heard's medical problems—in

part because they served in administrative roles in which they did not provide front-line care to inmates—and that in any event Heard received timely, adequate care.

I begin with a clarification of the scope of the claims. In their initial brief, defendants frame this set of claims as being limited to Heard's back pain. That's not correct: as I stated in my screening order, part of Heard's claims is that defendants failed to properly respond to an array of symptoms he suffered that ultimately led to him being diagnosed with cancer. Dkt. 7, at 4 ("In particular, they delayed arranging further treatment even after they knew that Heard was being assessed for cancer and that he was suffering severe symptoms in addition to his back pain."). But because defendants do discuss the events related to these additional symptoms in their summary judgment materials, the parties have joined issue on the entire set of claims on which I allowed Heard to proceed.

The undisputed evidence shows that starting in the fall of 2020, Heard continued to complain of back pain. But almost all of his complaints were reviewed by staffers other than Adams or Kinyon. Heard points to a September 7, 2020 health service request that Kinyon responded to, stating that Heard would be seen during nursing sick call that day, but Heard was not seen. However, Heard does not show that he was harmed by Kinyon's failure to ensure that Heard was seen that day; after he filed another health service request about his back pain the next day he was seen by a nurse.

Heard continued to be seen for his complaints by nurses and by Dr. Gross, with Gross referring him for an MRI of his lumbar spine. On October 28, 2020, staff sent Heard to the emergency room for his complaints of abdominal pain; the ER doctor's report noted unremarkable labs and a CT scan negative for diverticulitis or appendicitis. Staff continued to field Heard's complaints of abdominal pain: less than two weeks later, Gross ordered an

15

ultrasound of Heard's abdomen, a chest X-ray, and lab work, all of which were normal. None of this treatment suggests conscious disregard by medical staff, much less Adams or Kinyon, who were not front-line providers. I will grant summary judgment to defendants on Heard's Eighth Amendment claims during this period.

Heard received news that his condition was more serious after his November 25, 2020 MRI scheduled by Dr. Gross revealed degenerative disc disease and a finding of a kidney lesion that radiology suggested be evaluated further. About a week later, Heard met with Adams and Kinyon to discuss his abdominal pain and his kidney issue, with defendants telling him that his recent ultrasound was normal, that more labs were scheduled, and that staff would work on a plan of care after those lab results came back. Within a couple of days after that meeting, Heard's lab results came in, showing no major change from his results a few weeks prior, and Dr. Gross ordered another MRI. Nothing about Adams and Kinyon's response here suggests conscious disregard of Heard's condition.

Heard presents expert testimony from Dr. Susan Lawrence, an oncologist with experience treating prisoners. Dkt. 54-1. Lawrence opines that WSPF medical staff's response to Heard's symptoms and deteriorating condition was "abysmal" and "an extreme deviation from the standard of care." *Id.* at 14. Lawrence discusses Heard's physical decline as starting around October 28, 2020, but the specific examples that she gives regarding substandard care all relate to Heard's treatment starting in December 2020. She states that Dr. Gross "pursue[d] a leisurely oncologic workup on an outpatient basis rather than arrange for an expedited inpatient evaluation," and after December 9, 2020, didn't directly see Heard at all. *Id.* Instead, various nurses saw Heard at least nine times between December 14, 2020, and January 3, 2021, for complaints of back and abdominal pain, nausea, and vomiting, without notifying Dr. Gross

16

of Heard's deteriorating condition. On January 3, Heard was finally sent to the emergency room and then transferred to UW Hospital, where he remained for more than three weeks and was treated for a bowel obstruction and for cancer. Lawrence states that the standard of care for a patient with "worsening abdominal and back pain and progression to intractable nausea and vomiting" was immediate transfer to an emergency room. *Id.*, at 14–17.

A problem for Heard is that Lawrence generally refers to the prison medical staff as "defendants" and repeatedly criticizes various treatment decisions made by Dr. Gross and Health Service Unit nurses from this December 9 to January 3 period. But Heard isn't bringing claims against Gross or the nurses. Lawrence does not explicitly discuss the actions or inactions by the actual defendants in this case, Adams and Kinyon. Defendants say that they were not aware that Heard had a serious medical need because they held administrative roles in which they did not directly provide care to inmates.

Heard attempts to dispute this by submitting facts showing that the Health Services Unit was a small, collaborative environment, in which all of the staff—including supervisors Adams and Kinyon—had some awareness of and involvement in inmates' care. For instance, Heard cites a statement from Kinyon's deposition in which she stated that "we all" were responsible for monitoring inmates' health. Dkt. 69, at 9. And Heard's medical records show that both Adams and Kinyon had isolated incidents of involvement in Heard's treatment at WSPF and thus were loosely aware of his medical problems. But that isn't sufficient to show that either defendant was aware of Heard's deteriorating condition and that they consciously disregarded it, particularly given that Heard was being provided front-line care by other WSPF staff. The question remains what specific evidence Heard has to support his Eighth Amendment

claims against defendants for the key post-December 9 period during which Lawrence states that Heard should have been sent to the hospital for immediate treatment.

Heard does not provide such evidence against defendant Adams, other than noting Adams and Kinyon's December 14 phone call with Heard's sister about her concerns about Heard's health, and a nurse checking in with Adams before responding to a December 19 call about Heard's stomach pain and vomiting after hearing about his MRI results. Defendants' response to Heard's sister indicated that Heard was undergoing additional testing and that his provider would use those results to determine the next steps. And Adams appears to have responded to the December 19 call by approving a change in diet in response to what seemed to be Heard's anxiety over worrying MRI results. That evidence doesn't suggest that Adams consciously disregarded Heard's care. I will grant defendants' motion for summary judgment regarding Adams.

But Heard provides additional evidence against Kinyon. Heard states that before and after his December 29 liver biopsy, he discussed with Kinyon his worsening symptoms:

> A: So if we look towards the end of the year when my pain got—it got rough towards the end of 2020. Let's just say that. And I spoke with Kinyon personally about this and about the pain I was having, not being able to sleep, my urine changing colors, not being able to eat, throwing up. I spoke to Kinyon about all of this, me and her in the HSU room, and she prescribed certain things that she felt would help. It didn't, but that she felt would help . . . .

> Q: So she told you this in-person after the biopsy as well, correct?

> A: Yes. . . . This is—this was—the conversations that I'm having about my back pain now was said to me after the biopsy because I got worse, and I was seen like—you know, she was like, "We'll see you every day, keep checking in because of these things," and my whole thing with her was, "Why don't you just send me out? If I'm getting this worse, send me to the hospital."

Dkt. 34, at 34–36.

Kinyon disputes the substance of these conversations, but for purposes of summary judgment I must assume that they occurred as Heard describes them. This shows that Kinyon was aware of Heard's worsening symptoms. And Lawrence's expert testimony is enough to raise a reasonable inference that Kinyon knew that Heard's deteriorating condition needed to be treated at a hospital yet she refused to intervene, as she had the power to do. A reasonable jury could find for Heard on the portion of his Eighth Amendment claim against Kinyon for her actions or inactions after December 9, 2020.

Nonetheless, defendants state that they are entitled to qualified immunity on this claim. Under the doctrine of qualified immunity, a plaintiff may not obtain damages for a constitutional violation against a public official unless the plaintiff shows that the official violated clearly established law. *Abbott v. Sangamon County, Ill.*, 705 F.3d 706, 725 (7th Cir. 2013). A clearly established right is one that is sufficiently clear such "that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 566 U.S. 658, 664 (2012). Law is "clearly established" only if it is found in Supreme Court precedent, controlling circuit authority, or "a consensus of persuasive authority such that a reasonable officer could not have believed that his actions were lawful." *Wilson v. Layne*, 526 U.S. 603, 617 (1999). In other words, "existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011).

Defendants contend that it was not clearly established that the care Heard received was constitutionally deficient, that Kinyon had authority to overrule the treatment decisions of the treating medical professionals, or that the care Heard received was so plainly defective that they had to intervene. But the Court of Appeals for the Seventh Circuit has warned against

applying qualified immunity in Eighth Amendment cases because the merits of those claims and qualified immunity "effectively collapse into one" question in many circumstances. *Walker v. Benjamin*, 293 F.3d 1030, 1037 (7th Cir. 2002). Because the legal standard for Eighth Amendment medical care claims is well established and the disputes raised regarding such claims are largely factual rather than legal, "[i]f there are genuine issues of fact concerning th[e] elements [of the claim], a defendant may not avoid trial on the grounds of qualified immunity." *Id.*; *see also Estate of Clark v. Walker*, 865 F.3d 544, 553 (7th Cir. 2017) ("The Supreme Court has long held that prisoners have an Eighth Amendment right to treatment for their 'serious medical needs.' For purposes of qualified immunity, that legal duty need not be litigated and then established disease by disease or injury by injury."). And it isn't a legal question whether Kinyon could have taken action to help Heard; defendants conceded that they had the power to intervene in an inmate's medical treatment, including by sending him to the emergency room if necessary. So Kinyon is not entitled to summary judgment by way of qualified immunity. I will deny defendants' motion for summary judgment on the portion of Heard's Eighth Amendment claim against Kinyon for her actions or inactions after December 9, 2020.

## B. Wisconsin-law medical negligence

I granted Heard leave to proceed on parallel Wisconsin-law medical negligence claims against defendants. Defendants contend that these claims are barred because Heard did not comply with Wisconsin's notice of claim requirements under Wis. Stat. § 893.82.[2] But I have previously stated that that medical negligence claims brought against prison staff fall within the medical malpractice exception for filing a notice of claim in § 893.82(5m). *See, e.g., Seymour*

---

[2] Defendants acknowledge my prior rulings and state that they raise the issue to preserve it for appeal.

*v. Kostchyz*, No. 22-cv-170-jdp, 2022 WL 20328157, at *3 (W.D. Wis. Aug. 19, 2022). So a notice of claim is not required for Heard's state-law claims against Adams and Kinyon.

As for the merits of Heard's claims, "[a] claim for medical malpractice, as all claims for negligence, requires the following four elements: (1) a breach of (2) a duty owed (3) that results in (4) an injury or injuries, or damages." *Paul v. Skemp*, 2001 WI 42, ¶ 17, 242 Wis. 2d 507, 625 N.W.2d 860. Most of Heard's state-law claims fail for the same reasons that his constitutional claims do: defendants weren't involved in the knee-injection delays, Kinyon didn't cause a delay in Heard receiving a TENS unit, and for the most part there isn't sufficient evidence to show that defendants breached a duty to send Heard to the hospital for his back pain or symptoms connected to his later cancer diagnosis. The one exception is the portion of Heard's claim regarding Kinyon's failure to intervene in his care after December 9, 2020. Heard's expert testimony and his evidence of meetings with Kinyon about his deteriorating condition could lead a reasonable jury to conclude that Kinyon was negligent during that period. So I will deny that portion of defendants' motion for summary judgment.

CONCLUSION

I am granting summary judgment to defendants on most of Heard's claims, and defendant Adams will be dismissed. But the case will proceed to trial on Heard's Eighth Amendment and Wisconsin-law medical negligence claims against defendant Kinyon regarding her actions or inactions after December 9, 2020.

I will also amend the schedule to provide the parties with more time to submit their trial-related materials. The parties may now have until August 22, 2025, to submit their motions in limine; witness and exhibit lists; and proposed voir dire, jury instructions, and

verdict forms. The parties may have until September 3, 2025, to submit their responses to those materials.

## ORDER

IT IS ORDERED that:

1.  Defendants' motion for summary judgment, Dkt. 57, is GRANTED in part and DENIED is part as discussed in the opinion above.

2.  Defendant Adams is DISMISSED from the case.

3.  The schedule is AMENDED as discussed in the opinion above.

Entered July 31, 2025.

BY THE COURT:

/s/

_____

JAMES D. PETERSON
District Judge

22